# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

PSAUNTIA MARIE GEORGE,

       Defendant-Appellant.

UNPUBLISHED
March 7, 2017

No. 327812
Wayne Circuit Court
LC No. 14-001330-01-FC

Before: JANSEN, P.J., and BECKERING and GADOLA, JJ.

PER CURIAM.

Defendant, Psauntia George, appeals as of right her jury trial conviction of second-degree murder, MCL 750.317, and her sentence of 15 to 30 years in prison. We affirm both, but remand the matter for correction of defendant's presentence investigation report (PSIR).

This case arises out of the death of Martell Chambliss on January 25, 2014. Chambliss died on the floor of Snake's Auto Repair Shop, located at 3666 Mack Ave., in Detroit, Michigan, from a gunshot wound to his lower left abdomen. Within hours of the shooting, police arrested defendant and her husband, Kevin George, at their home at 3650 Mack Ave. The police took defendant to the Detroit Detention Center (DDC) and interrogated her for just over an hour beginning at 4:45 p.m. The interrogation was videotaped, and the videotape was admitted into evidence at defendant's trial and played for the jury in its entirety. Defendant gave police a statement indicating that she had an altercation with the victim, that her husband got involved, and that a gun was produced. The prosecution produced evidence at trial to establish that defendant was having sexual relations with the victim, and that she became angry and broke off the relationship when she found out he was bisexual.

## I. CHALLENGES TO DEFENDANT'S STATEMENT TO POLICE

### A. VOLUNTARY NATURE OF STATEMENT

Defendant first argues that the trial court erred by denying her motion to suppress the statement she gave to the police. She alleges that she gave the statement involuntarily, that it resulted from police coercion and the violation of her right to counsel.

Under *Miranda v Arizona*, 384 US 436, 444-445; 86 S Ct 1602; 16 L Ed 2d 694 (1966), a suspect subjected to custodial interrogation must be advised of his or her Fifth Amendment right

-1-

to have a lawyer present to protect the privilege against self-incrimination. A defendant "may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently." *People v Daoud*, 462 Mich 621, 633; 614 NW2d 152 (2000), quoting *Miranda*, 384 US at 444; 86 S Ct 1602. A waiver is voluntary if it is the "product of a free and deliberate choice rather than intimidation, coercion or deception." *Daoud*, 462 Mich at 635 (quotation marks and citation omitted). To determine whether a statement was voluntary, the court examines police conduct. *People v Tierney*, 266 Mich App 687, 707; 703 NW2d 204 (2005). "[D]etermining whether a suspect's waiver was knowing and intelligent requires an inquiry into the suspect's level of understanding, irrespective of police behavior." *Daoud*, 462 Mich at 636. "To knowingly waive Miranda rights, a suspect need not understand the ramifications and consequences of choosing to waive or exercise the rights that the police have properly explained to him." *People v Cheatham*, 453 Mich 1, 28; 551 NW2d 355 (1996). As the *Cheatham* Court further explained:

> To establish a valid waiver, the state must present evidence sufficient to demonstrate that the accused understood that he did not have to speak, that he had the right to the presence of counsel, and that the state could use what he said in a later trial against him. That is the meaning of intelligent waiver; that and no more. [*Id.* at 29 (quotation marks and citation omitted).]

"[T]he prosecutor has the burden of establishing a valid waiver by a preponderance of the evidence." *Daoud*, 462 Mich at 634.

The gravamen of defendant's argument is that the police coerced her into waiving her rights and giving a statement. Defendant testified at the *Walker*[1] hearing on her motion to suppress the statement that she told Sergeant Sims, one of her interrogators, that her family was sending a lawyer to meet her at the DDC. She further testified that Sims threatened that she would be charged with murder and he would testify against her unless she gave a statement, in which case she would be released. Defendant also said that Sims told her not to ask for a lawyer during the interview because one was on the way. Defendant said that this exchange with Sims occurred while they were outside, walking from the holding cell in one building to an interrogation room in another. She also said that she saw a man outside the interrogation room whom she later learned was her lawyer.

Sims denied threatening defendant in any way, and testified that her claim to have requested an attorney on the walk to the interrogation room was an "absolute lie." He said she explained that she had to walk slowly because she was recovering from a recent surgery, and asserted that she was not sedated and that she understood everything he said to her. The officer testified that he advised defendant of her right to remain silent and to have an attorney present, pursuant to *Miranda*, and that she signed the *Miranda* waiver form and agreed to speak with him and his partner, Sergeant Eby. Both Sims and Eby denied that defendant asked for an attorney. Defendant acknowledged that she did not ask for an attorney in the interrogation room and that she signed the waiver, but insisted that all the while she continued to want an attorney present.

---

[1] *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965).

After reviewing the record, we conclude that the trial court did not abuse its discretion by denying defendant's motion to suppress her statement. The prosecution presented evidence that defendant effectuated her rights under *Miranda* knowingly and intelligently, and there is no support in the record for defendant's claim that the police coerced her into signing the *Miranda* waiver with threats and false promises. The matter is essentially one of credibility involving defendant's contention of purposefully unrecorded threats by police juxtaposed against the officers' absolute denial of any such behavior or exchange. This Court has previously indicated that it

> will not disturb a trial court's ruling at a suppression hearing unless that ruling is found to be clearly erroneous. Resolution of facts about which there is conflicting testimony is a decision to be made initially by the trial court. The trial judge's resolution of a factual issue is entitled to deference. This is particularly true where a factual issue involves the credibility of the witnesses whose testimony is in conflict. [*People v Geno*, 261 Mich App 624, 629; 683 NW2d 687 (2004), quoting *People v Burrell*, 417 Mich 439, 448-449; 339 NW2d 403 (1983).]

Accordingly, "[g]iving proper deference" to the trial court's conclusions at the *Walker* hearing, including its determinations of credibility, we will not disturb the trial court's conclusion that that "there were no promises or threats made, and thus the factual predicate for defendant's argument is unsupported." *Geno*, 261 Mich App at 629. Consequently, defendant's argument fails.

## B. VIDEOTAPE INADMISSIBLE

In a supplemental brief, defendant argues that the trial court violated her right to a fair trial when it allowed the prosecutor to play for the jury the unedited videotape of her interrogation. Defendant contends that credibility was critical to the outcome of this case, given the lack of physical evidence implicating her in the homicide; therefore, it was unfairly prejudicial for the jury to hear the interrogators tell her repeatedly that her comments and explanations did not make sense, that she was lying, that they had found the murder weapon, and that they had "strong evidence" that she and Kevin were involved in the crime.

The decision to admit evidence is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *People v Musser*, 494 Mich 337, 348; 835 NW2d 319 (2013). An abuse of discretion exists if the trial court chooses an outcome outside the range of principled outcomes. *Id*. "However, if an evidentiary error is a nonconstitutional, preserved error, then it is presumed not to be a ground for reversal unless it affirmatively appears that, more probably than not, it was outcome determinative." *Id*. (quotation marks and citation omitted). "[A]n error is deemed to have been outcome determinative if it undermined the reliability of the verdict[, which] determination requires that [the Court] focus on the nature of the error in light of the weight and strength of the untainted evidence." *People v Krueger*, 466 Mich 50, 54; 643 NW2d 223 (2002).

In *Musser*, the Michigan Supreme Court addressed "whether the rule barring testimony regarding the credibility of another person excludes out-of-court statements to the same effect that are contained in the recordings or transcripts of an interrogation."[2] *Musser*, 494 Mich at 349. The Court resolved the issue by resorting to the rules of evidence. Specifically, the Court held that out-of-court statements not offered for the truth of the matter asserted must be relevant to their stated purpose. *Id*. at 355. An officer's statements during interrogation may be admissible to provide context for a defendant's responses, but if they are "offered to provide context to a defendant's statement that is not 'in issue,' it follows that both the interrogator's and the defendant's statements are immaterial and, thus, not relevant." *Id*. at 355. Further, if an out-of-court statement is relevant, the trial court must still consider whether the danger of unfair prejudice outweighs the statement's probative value. *Id*. at 356. The Court explained that, when evaluating a statement's probative value against its prejudicial effect,

> [A] trial court should be particularly mindful that when a statement is not being offered for the truth of the matter asserted and would otherwise be inadmissible if a witness testified to the same at trial, there is a danger that the jury might have difficulty limiting its consideration of the material to [its] proper purpose[ ]. [*Id*. at 357 (quotation marks and citation omitted, alterations by the *Musser* Court.]

In particular, "an out-of-court statement made by an investigating officer may be given undue weight by the jury where the determination of a defendant's guilt or innocence hinges on who the jury determines is more credible—the complainant or the defendant." *Id*. at 358 (quotation marks and citation omitted). Finally, if "an interrogator's out-of-court statement is determined to be admissible for the purpose of providing context for a defendant's statements," but it is not admissible for any other purpose, the court, upon request, must provide a limiting instruction. *Id*. at 358; MRE 105.

In the present case, the trial court found that assertions by the interrogators that defendant was being untruthful or her explanations did not comport with the known facts of the case provide context for the shifts in defendant's account of the events leading to the victim's death. We agree. The *Musser* Court recognized that a trial court may determine a police officer's statements made during an interrogation "to be admissible for the purpose of providing context for a defendant's statements[.]" *Musser*, 494 Mich at 358. As one court has succinctly explained:

---

[2] In *Musser*, a jury convicted the defendant of second-degree criminal sexual conduct. At issue were out-of-court statements made during police interrogation of the defendant where one officer opined at considerable length on the complainant's truthfulness and on the truthfulness of child victims in general, while another indicated that he had completed hundreds of forensic interviews specifically designed for use with children. *People v Musser*, 494 Mich 337, 343-345; 835 NW2d 319 (2013). The Court concluded that most of the interrogators' comments did not provide context for the defendant's responses, and that their minimal probative value was substantially outweighed by the danger of unfair prejudice to the defendant. *Id*. at 359-362.

By making such comments, the officer is not trying to convince anyone—not the defendant (who knows whether he or she is telling the truth), other officers, a prosecutor, or the jury—that the defendant was lying. Rather, such comments are part of an interrogation technique aimed at showing the defendant that the officer recognizes the holes and contradictions in the defendant's story, thus urging him or her to tell the truth. [*Lanham v Commonwealth*, 171 SW3d 14, 27 (2005).]

In the present case, defendant asked the trial court to suppress the entire videotaped interrogation based on the interrogators' statements questioning her credibility. However, as the foregoing shows, such comments can be admissible when used as an interrogation technique to uncover the truth and to provide context for a defendant's responses. Thus, the mere fact that the interrogator questioned defendant's credibility during the interrogation does not provide grounds for exclusion of the entire videotaped interrogation. Unlike the defendant in *Musser*, the present defendant has not pointed to any specific statements that were irrelevant because they did not provide context for her responses.[3]

In addition, defendant asserts that the trial court should have excluded the entire videotape because the interrogating officers falsified facts, for example, claiming to have found the murder weapon when they had not. However, our Supreme Court has long established that police officers may make false statements as part of their interview technique, as long as those statements are not designed to induce untrue statements in response. See *People v Utter*, 217 Mich 74, 80; 185 NW 830 (1921), overruled on other grounds by *People v Ora Jones*, 395 Mich 379; 236 NW2d 461 (1975), overruled by *People v Hawthorne*, 474 Mich 174; 713 NW2d 724 (2006). Finally, defendant claims that the negative affect of the officers' comments was worse here than in *Musser* because the trial court in the instant case did not provide an instruction limiting the jury's consideration of the officers' comments to their purpose of providing context for her response. As the *Musser* Court pointed out, "under MRE 105, if evidence is admissible for one purpose, but not admissible for another purpose, the court, upon request, *shall restrict the evidence to its proper scope* . . . ." *Musser*, 494 Mich at 358. The trial court in the present case did not provide a limiting instruction; however, defendant has not established that a limiting instruction was requested.

---

[3] In response to a panel member's question at oral argument, defendant's appellate attorney provided this Court with a brief clarifying trial counsel's objections to the video. We appreciate counsel's responsiveness. Nevertheless, we conclude that the clarification does not change our analysis. Trial counsel strenuously objected to admission of the video as a whole, primarily on grounds that it damaged defendant's credibility and the jury might believe the interrogators' falsifications. Counsel did not request redaction of any specific, irrelevant comments, even after the trial court signaled the propriety of redacting irrelevant statements made by either the police or defendant. Further, defendant has not identified on appeal any specific comments that were irrelevant because they did not provide context for her own responses.

In light of the foregoing, we conclude that the trial court did not abuse its discretion by admitting into evidence the videotape of defendant's interrogation based on its finding that the officers' comments about defendant's credibility provided context for her answers.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant next contends that the evidence presented at trial is not sufficient to sustain her conviction for second-degree murder under an aiding and abetting theory. She asserts that Delano Jones was not a credible witness, the physical evidence was at best inconclusive, and the remaining evidence was insufficient to prove her guilt beyond a reasonable doubt.

This Court reviews challenges to the sufficiency of evidence de novo. *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010). The test for determining the sufficiency of the evidence in a criminal case is whether the evidence, viewed in the light most favorable to the prosecution, would allow a rational trier of fact to conclude that the elements of the crime had been met beyond a reasonable doubt. *People v Hampton*, 407 Mich 354, 368; 285 NW2d 284 (1979). "[C]onflicts in the evidence are resolved in favor of the prosecution." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010) (quotation marks and citation omitted). In addition, "this Court must defer to the fact-finder's role in determining the weight of the evidence and the credibility of the witnesses." *Id*.

The jury convicted defendant of second-degree murder under an aiding and abetting theory. The elements of second-degree murder are:

> (1) a death, (2) the death was caused by an act of the defendant, (3) the defendant acted with malice, and (4) the defendant did not have lawful justification or excuse for causing the death. Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm. The prosecution is not required to prove that the defendant actually intended to harm or kill. Instead, the prosecution must prove the intent to do an act that is in obvious disregard of life-endangering consequences. [*People v Bergman*, 312 Mich App 471, 487; 879 NW2d 278 (2015) (quotation marks and citations omitted.]

The elements of aiding and abetting are

> (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement. [*People v Robinson*, 475 Mich 1, 6; 715 NW2d 44 (2006) (quotation marks and citations omitted).]

"To place the issue of aiding and abetting before the trier of fact, the evidence need only tend to establish that more than one person committed the crime, and that the role of a defendant charged as an aider and abettor amounts to something less than the direct commission of the offense." *People v Wilson*, 196 Mich App 604, 611; 493 NW2d 471 (1992), quoting *People v*

*Vaughn*, 186 Mich App 376, 382; 465 NW2d 365 (1990). "Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense." MCL 767.39.

The prosecutor's theory of the case was that defendant and Kevin went to the auto repair shop to confront the victim regarding threats and negative statements the victim made about his past sexual relationship with defendant and because defendant was upset after having discovered that the victim was bisexual. The prosecution produced no physical evidence at trial that placed defendant and Kevin in the garage with a weapon. Given this lack of physical evidence, a determination of guilt in this matter was highly dependent on circumstantial evidence and assessments of witness credibility.

Renee Attles testified to being present at the DDC contemporaneously with defendant, and a videotape of a room at the DDC on January 26, 2014, confirmed this assertion. Attles stated that defendant confessed to her and other prisoners in the DDC "bullpen" that defendant and Kevin, "did that nigga. We killed his ass." Attles further testified that defendant said, "He's not gonna tell on me. I'm not gonna tell on him. And we'll be home with our kids, soon." However, Karen Geletzke and Maurissa Mercedes, also in custody with defendant and Attles, denied hearing defendant confess to the murder. In addition, Geletzke recalled defendant intervening in an altercation between her and some of the other detainees, prompting one of them, but Geletzke could not say who, to threaten to falsely testify at defendant's trial.

Jones testified that defendant was his landlord in the residence next door to the auto repair shop, where he was the manager. Defendant and Kevin, her husband of two years, lived in the downstairs apartment with defendant's six children, and Jones lived in the upstairs apartment. Jones testified that the victim, whom he knew, was having sexual relations with defendant. Jones noted that he too was having what he described as casual sex with defendant. On the morning of the incident in question, Jones observed the victim driving in the neighborhood in his White Cadillac. Jones flagged him down and hired him to work on a brake job at the repair shop. Jones then returned to his apartment.

While Jones and his girlfriend, Daysha Easley, were in his apartment, defendant came up the stairs yelling "Go get your boy off the shop floor." Jones went directly to the shop, raised the garage door, and observed the victim on the floor. He ran back to his apartment and instructed Easley to call the police. He then ran back to defendant's door to ask what happened, and she responded, "I didn't do nothing." Jones reported that while Easley was calling the police, defendant said, "Ya'll gonna call the police on me about this faggot M------ F-----." Jones said that when the police arrived, Kevin left his and defendant's apartment by the backdoor, jumped over a gate behind the building, and remained gone for about five minutes, and defendant was on the front porch "screaming and hollering" at him (i.e., Jones).

Easley confirmed the sequence of events related by Jones regarding defendant coming to the apartment and informing them that the victim was "laid [sic] out in the shop." Easley initiated the telephone calls to 9-1-1 and testified that, due to a lack of responsiveness, she called 9-1-1 more than once and also engaged her cousin in trying to contact 9-1-1- for assistance. The next time Easley observed defendant, defendant was next to the victim with a stethoscope

indicating that he had "a low pulse" and "will die." While on the telephone with emergency services, Easley reported hearing defendant say: "You gonna keep calling the police over this faggot-ass bitch[?]" In contrast, defendant testified at trial that Jones and others ignored her requests to transport the victim to the hospital. The victim's grandmother, Florence Chambliss, testified that she was transported to the scene of the incident after police were summoned and she observed defendant standing in the front yard of her home, cursing at Jones and the police, and "clowning," which Chambliss defined as shouting and showing anger.

Detroit Police Officer Danyell Robinson, Sr., responded to the scene and observed that the driver's window of the victim's car, which was parked in front of the repair shop, had been shattered. Jones testified that the victim's car had not been damaged when he arrived at the shop. According to the medical examiner, the victim died as a result of a gunshot wound to his left lower abdomen, which the examiner concluded was neither self-inflicted nor the result of a ricochet or a bullet fired at close range. The medical examiner opined that the weapon was discharged 2 or 3 feet from the victim. The victim also had bruising along with various contusions and abrasions to his face and hands, suggesting his involvement in a physical altercation rather than a fall.

In her statement to the police, defendant first asserted that she found the victim dead, on the garage floor, and she went to Jones to request help. She asserted that Jones and the victim had been arguing earlier in the day. When police challenged her truthfulness, defendant admitted having a sexual relationship with the victim in the past, but said she ended it when she learned he was gay. Defendant asserted that the victim grabbed her and tried to strike her, and that she pushed him away and called for Kevin's assistance. The parties "tussled," but when the altercation ceased, defendant left with Kevin and the victim was alive. Defendant explained that she contacted Jones regarding the incident to tell him that the victim was behaving erratically. Again changing her account, defendant indicated that although she never heard a gunshot, the victim did brandish a firearm. She continued to deny striking the victim and could not explain his hand and facial injuries. She then accused Jones of killing the victim.

Defendant's final version of events as described to the police involved defendant going to the garage and the victim opening the door and dragging her inside. She said the victim was angry that she had discovered he was gay. She called out to Kevin, who entered to defend her. The victim then pulled out a handgun. Kevin struggled with the victim trying to remove the gun while she was simultaneously telling Kevin to "get the gun" because she was fearful the victim would discharge the weapon at her or Kevin. During the struggle, the victim and Kevin were on the ground. When Kevin was pulled off of the victim, the victim was on his side and talking. She did not hear or see a wound from a gunshot. That is when she went to ask Jones to go check on the victim. After returning home, defendant questioned Kevin about his short absence from their residence, and Kevin indicated that he was "taking care of something." Defendant stated that Kevin expressed that he did not intend for the incident to go "that far" and that it was a "mistake."

At trial, defendant denied confessing to Attles or others while at the DDC. She acknowledged receiving threatening messages from the victim, which led her to give the victim Kevin's telephone number. Although denying any recent conflicts with the victim, defendant admitted to contacting someone to inquire into the victim's sexual preferences, which the victim

found upsetting. Denying the voluntary nature of her statement to police, defendant testified that she did not have any contact with the victim on the day of the murder until Jones had approached her for assistance in checking on the victim's status in the repair shop.

We conclude that, viewed in the light most favorable to the prosecution, the evidence was sufficient to allow a rational trier of fact to find the elements of second-degree murder under an aiding and abetting theory proven beyond a reasonable doubt. It is undisputed that a death occurred, and Attlee's testimony, if credited by the jury, provides evidence that defendant and Kevin caused it. In addition, the jury could reasonably infer defendant and Kevin's involvement in the victim's death from defendant's statement recounting the confrontation with the victim, Jones' testimony about Kevin's brief disappearance over the backyard fence, and statements made by defendant after the victim's death. Likewise, the jury could have inferred the intent to kill or to do great bodily harm from the medical examiner's testimony that the victim was shot with a handgun from a distance of two or three feet. Regarding defendant's participation under an aiding and abetting theory, the jury could reasonably infer from the circumstances and from defendant's statements about the victim that she initiated or encouraged Kevin to initiate the confrontation with the intent to do the victim great bodily harm or, at the very least, with wilful disregard that the confrontation could result in the victim's death or great bodily harm. Consistent with defendant's steadfast denial that she or Kevin shot the victim, she has not asserted a lawful justification or excuse for causing the death. In light of the foregoing, the evidence was sufficient to allow the jury to find defendant guilty beyond a reasonable doubt of the charged crimes. Accordingly, there is no violation of defendant's due-process rights.[4]

## III. DEFENDANT'S STANDARD 4 ISSUES[5]

### A. EXCULPATORY EVIDENCE

Defendant next contends that the prosecution committed a *Brady* violation by denying her access to exculpatory evidence. Specifically, defendant contends that she requested, and the prosecution agreed to provide, copies of information and messages retrieved from confiscated cellular telephones, and that such information and messages would have demonstrated a non-contentious relationship with the victim and would have served to impeach Jones' testimony regarding his efforts to contact defendant or communications with the victim.

" '[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' " *People v Chenault*, 495 Mich 142, 149; 845 NW2d 731 (2014), quoting *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963). To establish a *Brady* violation, a defendant must demonstrate that: "(1) the prosecution

---

[4] Given our analysis of this issue, we need not address defendant's claim in her supplemental brief that the trial court erred by instructing the jury on aiding and abetting.

[5] A "Standard 4" brief refers to a brief filed on behalf of an indigent criminal defendant pursuant to Michigan Supreme Court Administrative Order 2004-6, Standard 4.

has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *Id.* at 150. "Evidence is favorable to the defense when it is either exculpatory or impeaching. *Id.*, citing *Giglio v United States*, 405 US 150, 154; 92 S Ct 763; 31 L Ed 2d 104 (1972). Evidence is exculpatory when it tends to establish a criminal defendant's innocence. *Black's Law Dictionary* (10th ed), p 675. "To establish materiality, a defendant must show that 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Chenault*, 495 Mich at 150, quoting *United States v Bagley,* 473 US 667, 682; 105 S Ct 3375; 87 L Ed 2d 481 (1985). "This standard 'does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal....' " *Chenault*, 495 Mich at 150, quoting *Kyles v Whitley,* 514 US 419, 434; 115 S Ct 1555; 131 L Ed 2d 490 (1995). Rather, " '[t]he question is whether, in the absence of the suppressed evidence, the defendant received a fair trial, understood as a trial resulting in a verdict worthy of confidence. In assessing the materiality of the evidence, courts are to consider the suppressed evidence collectively, rather than piecemeal.' " *Chenault*, 495 Mich at 150-151, quoting *Kyle*, 514 US at 434, 436; 115 S Ct 1555.

Assuming for the sake of argument that the prosecution did suppress the cell phone records to which defendant refers, defendant contends that the records were favorable for her defense because they were exculpatory. She asserts that they would have established the absence of animosity between her and the victim by showing that she had had no contact with him from early November 2013 until his death on January 25, 2014. However, it does not necessarily follow that a lack of telephone contact is evidence of a lack of animosity. The prosecution's theory of the case was that the victim's death resulted from a physical confrontation on January 25, 2014, and the prior absence of telephone contact does not undercut that theory. Additionally, defendant's disparaging remarks about the victim, uttered as he lay dying or dead, betrayed a strong disregard for him. Defendant also contends that the telephone records were favorable because of their impeachment potential. Specifically, defendant contends that she would have used them to impeach Jones' testimony by demonstrating that he attempted to contact the victim earlier on the day of the murder. However, there was no related testimony to impeach; neither party asked Jones, nor did he indicate, whether he had attempted to reach the victim by telephone before he saw him driving in the neighborhood and flagged him down. Further, that Jones may have telephoned the victim earlier in the day does not conflict with Jones' testimony that he wanted the victim to work on the brakes of a car in the auto shop. Considering defendant's argument in light of the record, we cannot conclude that the telephone-record evidence defendant claims the prosecution withheld would have tended to establish defendant's innocence or produced a different outcome at trial. Therefore, defendant has failed to establish a *Brady* violation because she has not demonstrated that the evidence she claims the prosecution suppressed was favorable or material.

-10-

## B. PROSECUTORIAL MISCONDUCT

Defendant asserts that the prosecutor made numerous false or misleading comments during opening and closing arguments that did not comport with the evidence. Specifically, defendant alleges that the prosecutor engaged in misconduct by: (a) suggesting the victim was involved in an altercation with defendant and Kevin, and that defendant intended to harm the victim because she was angry or upset with the victim, (b) referencing Kevin and suggesting his involvement in related criminal proceedings, (c) inferring that defendant demonstrated a lack of concern for the victim despite having urged individuals at the scene to transport him for medical care and calling 9-1-1, and (d) intimating defendant's statement that she was cooking breakfast for her children at the time of the events was untrue. Defendant further asserts that improper comments by the prosecutor violated her right to confrontation because arguing facts not in evidence rendered the prosecutor an unsworn witness against her. Defendant argues that the prosecutor's misconduct was highly prejudicial and outcome determinative.

To preserve a claim of prosecutorial misconduct, it is incumbent on a defendant to "contemporaneously object" to the alleged misconduct while requesting a "curative instruction." *Bennett*, 290 Mich App at 475. Because defendant did not preserve the errors she alleges on appeal "by a contemporaneous objection and a request for a curative instruction, appellate review is for plain (outcome-determinative) error." *People v Callon*, 256 Mich App 312, 329; 662 NW2d 501 (2003). "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error ' "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings" ' independent of the defendant's innocence." *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999), quoting *United States v Olano*, 507 US 725, 736-737; 113 S Ct 1770; 123 L Ed 2d 508 (1993), quoting *United States v Atkinson*, 297 US 157, 160; 56 S Ct 391; 80 L Ed 555 (1936).

Prosecutors may not make statements of fact to the jury that are unsupported by the evidence. See *People v Stanaway*, 446 Mich 643, 686; 521 NW2d (1994). However, they are "free to argue the evidence and all reasonable inferences from the evidence as it relates to [the prosecutor's] theory of the case[,]" *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995), and need not state their inferences in the blandest possible terms, *People v Dobek*, 274 Mich App 58, 66; 732 NW2d 546 (2007). "The prosecutor's remarks are reviewed as a whole in evaluating the propriety of those remarks." *People v Whitfield*, 214 Mich App 348, 352; 543 NW2d 347 (1995). "The test of prosecutorial misconduct is whether the defendant was denied a fair and impartial trial." *People v Brown*, 279 Mich App 116, 134; 755 NW2d 664 (2008). "The defendant bears the burden of demonstrating that such an error resulted in a miscarriage of justice." *Id*. "[W]e cannot find error requiring reversal where a curative instruction could have alleviated any prejudicial effect." *Callon*, 256 Mich App at 329-330.

Three of defendant's four objections are merely examples of the prosecution arguing reasonable inferences from the evidence presented at trial. Jones testified that defendant had had a sexual relationship with the victim. Although defendant denied having any current problem with the victim, she acknowledged that the victim had sent her threatening messages in the past and that it upset him when she asked people about his sexual preferences. The medical examiner testified that the victim had been in an altercation prior to his death. He also testified that the victim's fatal wound was not self-inflicted and did not result from a ricocheted bullet or from a

-11-

struggle over the gun that fired the bullet. In addition, Jones and Easley recounted the disparaging remarks defendant made with regard to the victim, which implied that the victim was not worth the effort they were making to call for assistance. This evidence gives rise to the reasonable inferences that defendant harbored some animosity toward the victim because of his sexual orientation, and that she was unconcerned about his fate. Likewise, although defendant claimed to be making breakfast for her six children, Officer Green's testimony to the absence of food and of any sign of food preparation in defendant's house gives rise to the reasonable inference that defendant's claim was untrue.

Defendant's fourth objection arises from a statement made by the prosecutor while she was addressing the concept of aiding and abetting. The prosecutor said, "The testimony that comes in about the defendant's husband, that conviction – That's a separate case, a separate trial. We're here today for [defendant's] involvement in it. So, we need to keep those separately. And like it says, it doesn't matter whether anybody else has been convicted of the crimes." Although we agree that the prosecutor's reference to Kevin George was improper, we conclude that it did not rise to the level of prosecutorial misconduct. Not only was the prosecutor's reference extremely brief, but the prosecutor immediately corrected herself by telling the jury that the reference was irrelevant to the matter before it. In addition, the trial court instructed the jury that statements or questions by the attorneys did not constitute evidence. Therefore, given the brevity of the reference, the prosecutor's self-correction, and the trial court's instructions to the jury, we cannot say that defendant has shown that the error deprived defendant of a fair and impartial trial or resulted in a miscarriage of justice.[6] *Brown*, 279 Mich App at 134.

We conclude that there is no prosecutorial misconduct where the prosecutor drew reasonable inferences from the evidence presented at trial, and note that the inferences drawn by the prosecutor need not be the only possible inferences, just reasonable ones as they relate to the theory of the case. See *Bahoda*, 448 Mich at 282. We also conclude that the court's instructions to the jury regarding what is and is not evidence alleviated any prejudice that could have arisen from the prosecutor's improper reference to a separate trial or conviction for defendant's husband. See *People v Roscoe*, 303 Mich App 633, 646; 846 NW2d 402 (2014) (noting, "jurors are presumed to follow their instructions"). Finally, given that the prosecution's other comments were not evidence, but were based on evidence, and that defendant had the opportunity to cross-examine each witness and object to the admission of each piece of evidence, we reject defendant's assertion that the prosecution's comments deprived her of her Sixth Amendment right of confrontation.

---

[6] Defendant raises the same issue in a supplemental brief that, in light of our analysis here, we need not address.

## C. SUPPRESSION OF EVIDENCE

Defendant contends that the report detailing the inconclusive results of a DNA analysis of blood stains found on her jacket was of little relevance and was more prejudicial than probative, and therefore, that the trial court erred by denying her motion to suppress.

We review the trial court's factual findings in a suppression hearing for clear error, and will affirm them unless "we are left with a definite and firm conviction that a mistake was made." *People v Davis*, 250 Mich App 357, 362; 649 NW2d 94 (2002). We review a trial court's ultimate decision on a motion to suppress de novo. *Id*.

"Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. "All relevant evidence is prejudicial; it is only unfairly prejudicial evidence that should be excluded." *People v McGhee*, 268 Mich App 600, 613-614; 709 NW2d 595 (2005). "Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *People v Mardlin*, 487 Mich 609, 627; 790 NW2d 607 (2010).

The use of DNA evidence in this matter was probative of a material issue, i.e., the identity of the perpetrator. Moreover, the DNA analysis of the bloodstains on defendant's jacket and the swabs taken from her hands and the hands of the victim was not unfairly prejudicial; in fact, it was favorable to defendant. While the DNA analysis indicated that a male had contributed some of the blood on defendant's jacket, the analysis could not definitively conclude that the male contributor was the victim. Likewise, the DNA evidence obtained from the victim's and defendant's hands seemed to contradict the prosecution's theory that the two engaged in physical contact that resulted in injury to the victim. Thus, the DNA analysis was relevant to whether defendant was the perpetrator of the charged crime, and the report's inconclusiveness made it unlikely that the report's prejudicial effect would outweigh its probative value. Whatever prejudicial effect may have remained the trial court presumably alleviated with its instructions to the jury regarding the jury's responsibility to determine the facts of the case and the credibility of the witnesses, including expert witnesses, and to weigh the evidence. Jurors are presumed to follow their instructions. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229, 234 (1998). In light of the relevance of the contested evidence, its favorability to defendant, and the trial court's instructions to the jury, we are not left "with a definite and firm conviction that a mistake was made." *Davis*, 250 Mich App at 362.

## D. WARRANT CHALLENGES

### 1. *FRANKS* CHALLENGE[7]

Defendant also argues that the trial court erred by denying her request for an evidentiary hearing to determine the validity of a search warrant's affidavit. Whether to conduct an

---

[7] *Franks v Delaware*, 438 US 154, 171; 98 S Ct 2674; 57 L Ed 2d 667 (1978).]

evidentiary hearing upon a challenge to the validity of the affidavit is in the discretion of the trial court. *People v Martin*, 271 Mich App 280, 309; 721 NW2d 815 (2006). A trial court has not abused its discretion if its decision results in an outcome within the range of reasoned and principled outcomes. *People v Duncan*, 494 Mich 713, 722-723; 835 NW2d 399 (2013). However, this Court reviews the facts supporting a denial of an evidentiary hearing for clear error and the application of those facts to the law de novo. *Martin*, 271 Mich App at 309. "Clear error is present when the reviewing court is left with a definite and firm conviction that an error occurred." *People v Fawaz*, 299 Mich App 55, 60; 829 NW2d 259 (2012), quoting *People v Buie*, 491 Mich 294, 315-316; 817 NW2d 33 (2012).

A defendant has the right to challenge the truthfulness of an affidavit's factual statements, but "under a difficult standard":

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. [*People v Waclawski*, 286 Mich App 634, 701; 780 NW2d 321 (2009), quoting *People v Turner*, 155 Mich App 222, 226-227; 399 NW2d 477 (1986), quoting *Franks v Delaware*, 438 US at 171.]

The defendant has the burden of showing, by a preponderance of the evidence, that the affiant knowingly and intentionally, or with a reckless disregard for the truth, inserted false material into the affidavit and that the false material was necessary to the finding of probable cause. *Waclawski*, 286 Mich App at 701.

Sergeant Sims signed the affidavit that supported a search warrant issued and executed on January 28, 2014. Sims relied on observations made by Jones and of the police officer who entered the house and found that someone had just started to wash a load of clothes in the washing machine. Defendant contends that the search warrant "was improperly obtained based on Delano Jones [sic] false statements which were knowingly false and intentionally misleading[,]" and concludes therefrom that the trial court erred by denying her request for a hearing to determine Jones's veracity. She also contends that police entered her home without legal justification because a police report states that police arrested her and her husband outside

of the house.[8] Thus, any observations the police made while they were in her home illegally could not provide probable cause for the search warrant.

The purpose of a *Franks* hearing is not to determine the credibility of the person who supplied police with information. Rather, the purpose of the hearing is to determine whether Sergeant Sims knowingly and intentionally, or with reckless disregard for the truth, inserted false material into the affidavit. *Id.* Nevertheless, defendant has made no allegations against Sims of "deliberate falsehood or of reckless disregard for the truth." *Franks*, 438 US at 171. Consequently, defendant has failed to overcome the presumption of the affidavit's validity. Accordingly, the trial court did not abuse its discretion by denying her request for an evidentiary hearing to challenge the truthfulness of the affidavit.

### 2. STALE WARRANT

Defendant also contends that the search warrant was "stale," noting that it was issued and executed on the third day after the crime, and that failure to secure the home had resulted in its obvious disruption.

A search warrant is deemed to be stale "if the probable cause, while sufficient at some point in the past, is now insufficient as to evidence at a specific location." *United States v Abboud*, 438 F3d 554, 572 (CA 6, 2006).[9] The length of time between the events listed in the affidavit and the application for the warrant is salient, but not controlling. *Id.* "It is possible that even if a substantial amount of time had elapsed between a defendant's last reported criminal activity and the issuance of the warrant, the warrant had not become stale." *Id.* (quotation marks and citation omitted). Factors considered in determining the issue of "staleness" include: (a) "the character of the crime," (b) "the criminal," (c) "the thing to be seized," and (d) "the place to be searched." *Id.* at 572-573 (quotation marks and citations omitted).

Police obtained and executed the search warrant at issue on the third day after the subject homicide. The place to be searched was the home of the primary suspects in the homicide, whom Jones had informed investigating officers had entered the residence after leaving the crime scene. To be seized was clothing police thought one of the suspects had worn while committing the crime. Nothing in the record indicates that the police expected the home to be occupied while the suspects were in custody. Thus, there was no reason why the clothing police thought to be in the washing machine on the day of the crime would not still be there three days later.

---

[8] An "Investigator's Report Supplement" dated January 25, 2014, states that "Officers Jana Greeno, Jessica McDonald, and Stephen Jackson will testify to arriving at the scene . . ., to witnesses telling them that both defendants were inside the house, they arrested both defendants and confiscated two shotguns that were in plain view." At trial, Officer Jackson testified that he arrested Kevin in a bedroom inside the house.

[9] Lower federal court decisions are not binding on this Court, but they may be considered on the basis of their persuasive analysis. *People v Patton*, 285 Mich App 229, 234; 775 NW2d 610 (2009).

Because probable cause existed to presume that evidence relevant to the homicide remained on the premises to be searched, the search warrant was not stale. See *People v Osborn*, 122 Mich App 63, 66; 329 NW2d 533 (1982) ("[T]he measure of a search warrant's staleness rests not on whether there is recent information to confirm that a crime is being committed, but whether probable cause is sufficiently fresh to presume that the sought items remain on the premises" (internal quotation marks and citation omitted)). Defendant's contention that a delay in the effectuation of the search warrant permitted the residence to be compromised and called into question the evidentiary value of the items confiscated is more properly framed as a question of the weight to be attributed to the evidence rather than its admissibility. *McGhee*, 268 Mich App at 624. And as we stated elsewhere in this opinion, this Court "must defer to the fact-finder's role in determining the weight of the evidence . . . ." *Bennett*, 290 Mich App at 472.

## E. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends that her trial counsel rendered constitutionally ineffective assistance when he failed to obtain her medical records from her physician or to secure an expert medical witness to opine on the effect that medication prescribed for her would have on her capacity to provide a statement voluntarily.[10] This issue comes to the Court unpreserved because defendant did not move in the trial court for a new trial or a *Ginther*[11] hearing. *People v Wilson*, 242 Mich App 350, 352; 619 NW2d 413 (2000). Our review of unpreserved claims of ineffective assistance of counsel is limited to errors apparent on the record. *Id*.

The determination of whether a defendant has been deprived of the effective assistance of counsel presents a mixed question of fact and constitutional law. *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). Generally, to establish ineffective assistance of counsel, a defendant must show: (1) that counsel's performance was below an objective standard of reasonableness under prevailing professional norms; (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *Strickland v Washington*, 466 US 668, 688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *Trakhtenberg*, 493 Mich at 51. "Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *People v Seals*, 285 Mich App 1, 17; 776 NW2d 314 (2009) (quotation marks and citation omitted).

We first note that defense counsel subpoenaed defendant's medical records and informed the trial court on September 19, 2014 that he was going to pick them up, and nothing in the

---

[10] Defendant also contends that counsel rendered ineffective assistance when he failed to object to the alleged prosecutorial misconduct and *Brady* violation discussed elsewhere in this opinion. As we have rejected these underlying claims, they cannot support claims of ineffective assistance. Counsel is not ineffective for failing "to advocate a meritless position." *People v Mack*, 265 Mich App 122, 130; 695 NW2d 342 (2005) (quotation marks and citation omitted).

[11] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973). This Court denied defendant's motion to remand for an evidentiary hearing. *People v George*, unpublished order of the Court of Appeals, issued June 22, 2016 (Docket No. 327812).

record indicates that defense counsel did not do as he said he would. Thus, defendant's claim that her trial counsel rendered ineffective assistance by failing to obtain her medical records must be rejected as contrary to the trial court record.

We turn next to defendant's assertion that her trial counsel rendered ineffective assistance when he failed to engage an expert medical witness[12] to explain the potential effects of the medication defendant's physician had prescribed. "An attorney's decision whether to retain witnesses, including expert witnesses, is a matter of trial strategy." *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009). The decision whether to admit evidence, including expert testimony, is within a trial court's discretion. *People v Bynum*, 496 Mich 610, 623; 852 NW2d 570 (2014). "The trial court acts as a gatekeeper for expert testimony and has a fundamental duty to ensure that the proffered expert testimony is both relevant and reliable." *Id.* at 624.

Subsequent to defendant's *Walker* hearing, but before the trial court issued its ruling, defendant filed a notice of an insanity defense, MCL 768.20a, alleging that, "due to a psychiatric or medical condition," defendant was "mentally incapable of having the capacity to voluntarily make a statement confession admissible as evidence" in the matter at issue. Defense counsel explained at the hearing on the motion that defendant had been on prescription medication at the time of the interrogation, and he was trying to contact defendant's physician to "see whether she'd have the mental capacity to make a voluntary confession." However, the trial court clearly signaled its skepticism regarding the reliability or relevancy of expert testimony regarding the effects of medication prescribed to defendant. Although an expert might be able to testify to the general effects of the medications prescribed, effects familiar to anyone who has taken a prescription medication, the court opined, the expert could not testify regarding whether defendant had taken the medication as prescribed, how she had taken it, and how it affected her, given her particular physiology. The trial court also noted that it had viewed the videotape of defendant's interrogation and, while no expert in the field of medicine, it observed no signs indicating an impediment to defendant's functionality. In addition, the officers who interrogated defendant testified at her *Walker* hearing that, although she complained of some pain and had to walk at a slower pace, she exhibited no signs of needing additional accommodation or being under the influence of medication.

In light of the officers' testimony, the trial court's observations after viewing the videotaped interrogation, and given the trial court's apparent skepticism regarding the need for or relevance of an expert witness's opinion in this matter, defendant has not overcome the presumption that the trial counsel's decision not to engage an expert medical witness constituted a sound strategic decision. Accordingly, she has not overcome the presumption that trial counsel rendered effective assistance. *Seals*, 285 Mich App at 17. Finally, defendant contends that the cumulative effect of the above referenced errors constituted ineffective assistance by her counsel

---

[12] As defense counsel explained to the trial court, he had been in contact with the office of defendant's physician, but her physician was himself hospitalized and unavailable to discuss what effect defendant's prescribed medications might have had on her mental capacity to make a voluntary confession.

at trial. However, because she has failed to establish a claim for ineffective assistance of counsel, there can be no cumulative effect of errors necessitating reversal. *Dobek*, 274 Mich at 106.

## F. SENTENCING ERRORS

Defendant also contends that the trial court erred in the scoring of offense variables (OVs) 1 and 6, and asserts that she is entitled to a *Crosby*[13] remand based on the use of judicial fact-finding in the scoring of the challenged OVs. See *People v Lockridge*, 498 Mich 358, 364; 870 NW2d 502 (2015).

## 1. SCORING ERRORS

Generally, the circuit court's factual determinations are reviewed for clear error and need only be supported by a preponderance of the evidence. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute is a question of statutory interpretation, which this Court reviews de novo. *Id*. This Court also reviews de novo, as a question of law, the proper interpretation of the sentencing guidelines. *Id*.

Defendant first argues that the trial court erred in its assessment of OV 1 at 25 points. OV 1 assesses points for "aggravated use of a weapon." MCL 777.31(1). In relevant part, the statute provides:

> (1) Offense variable 1 is aggravated use of a weapon. Score offense variable 1 by determining which of the following apply and by assigning the number of points attributable to the one that has the highest number of points:

> (a) A firearm was discharged at or toward a human being or a victim was cut or stabbed with a knife or other cutting or stabbing weapon ………………25 points

Defendant bases her objection to an assessment of 25 points for OV 1 on the assumption that such assessment requires a showing that she "used a firearm by discharging it or pointing it at a decedent." Defendant has misconstrued the law. A trial court must assign 25 points to OV 1 where "[a] firearm is discharged at or toward a human being." In the instant case, the medical examiner testified that the victim's fatal gunshot wound was not self-inflicted or the result of a ricochet or of a struggle for the gun, and that it was fired from two to three feet away. Thus, the preponderance of the evidence indicates that a firearm was discharged toward the victim. Nevertheless, judicial fact-finding was used to score OV 1, as defendant denied that she or her husband fired a gun, and the discharge of a firearm toward the victim was not an element of second-degree murder under an aiding and abetting theory that the jury found beyond a reasonable doubt.

---

[13] *United States v Crosby*, 397 F3d 103 (CA 2, 2005), abrogated on other grounds by *United States v Fagans*, 406 F3d 138 (CA 2, 2005).

Defendant next challenges the trial court's assessment of 25 points for OV 6. A trial court may assess 25 points for OV 6 if "[t]he offender had unpremeditated intent to kill, the intent to do great bodily harm, or created a very high risk of death or great bodily harm knowing that death or great bodily harm was the probable result." MCL 777.36(1)(b). The sentencing judge shall score this variable consistent with a jury verdict unless the judge has information that was not presented to the jury." MCL 777.36(2)(a). A jury convicted defendant of second-degree murder, which required the jury to find beyond a reasonable doubt that defendant acted with malice. MCL 750.317. "Malice" as it relates to second-degree murder is defined as "the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *People v Werner*, 254 Mich App 528, 531; 659 NW2d 688 (2002) (quotation marks and citation omitted). Thus, the trial court's assessment of 25 points for OV 6 is correct because it is consistent with the jury verdict. MCL 777.36(2)(a). The trial court did not base its assessment on judge-found facts, but on facts the jury found beyond a reasonable doubt. Consequently, the 25 points scored for OV 6 are irrelevant to defendant's *Lockridge* challenge.

Finally, defendant asserts that she is entitled to a *Crosby* remand because the trial court's use of judicially found facts to score OVs 1 and 6 mandatorily increased her guidelines minimum range. The trial court sentenced defendant prior to July 29, 2015, and defendant did not preserve this claim of error by raising it in the trial court, see *People v Stokes*, 312 Mich App 181, 198; 877 NW2d 752 (2015), or by filing a motion with this Court seeking a *Crosby* remand, MCR 6.429(C). Therefore, our review is for plain error affecting substantial rights. See *Lockridge*, 498 Mich at 392. "To establish entitlement to relief under plain-error review, the defendant must establish that an error occurred, that the error was plain, i.e., clear or obvious, and that the plain error affected substantial rights." *Id.* at 392-393. Further, as we indicated above, *Lockridge* is not implicated in the trial court's scoring of OV 6 because the trial court scored the variable using facts the jury found beyond a reasonable doubt.

The *Lockridge* Court held that Michigan's sentencing guidelines are "constitutionally deficient" to "the extent [that they] *require* judicial fact-finding beyond the facts admitted by the defendant or found by the jury to score offense variables that *mandatorily* increase the floor of the guidelines minimum sentence range . . . ." *Id*. at 364. Any fact that, by law, increases the penalty for a serious crime is an "element" that must be submitted to the jury and found beyond a reasonable doubt. *Id*. at 370, citing *Apprendi v New Jersey*, 530 US 466, 490; 120 S Ct 2348, 147 L Ed 2d 435 (2000).

Defendant's prior record variable (PRV) score is zero, and her OV score is 75, putting her in the A-II sentencing grid with a minimum sentencing range of 144 to 480 months; the trial court sentenced defendant within the guidelines. Deducting the 25 points assessed for OV 1 using judicially found facts does not change defendant's sentencing grid. Thus, the facts admitted by defendant or determined by the jury "were sufficient to assess the minimum number of OV points necessary for the defendant's score to fall in the cell of the sentencing grid under which he or she was sentenced." *Lockridge*, 498 Mich at 394. Consequently, defendant is not entitled to a *Crosby* remand because she "suffered no prejudice from any error." See *id* at 394-395.

## 2. PRESENTENCE INVESTIGATION REPORT

Finally, defendant contends that the trial court erred in failing to correct errors in her PSIR regarding: (a) the marital status of her parents, (b) information pertaining to Kevin's provision of care for her minor children and (c) use of a description of the events or crime taken from the police report.

"This Court reviews a trial court's response to a defendant's challenge to the accuracy of a PSIR for an abuse of discretion." *People v Uphaus (On Remand)*, 278 Mich App 174, 181; 748 NW2d 899 (2008). "A trial court abuses its discretion when it selects an outcome outside the range of reasonable and principled outcomes." *Id.*

As this Court has previously discussed:

> It is presumed that unchallenged information in the PSIR is accurate, and a judge is entitled to rely on the information unless a defendant raises an effective challenge. When information is challenged, the sentencing court has wide latitude in how to respond to the challenged information. The court may determine the accuracy of the information, accept the defendant's version, or simply disregard the challenged information. However, if the court chooses to disregard the challenged information, it must clearly indicate that it did not consider the alleged inaccuracy in determining the sentence. If the court finds the challenged information inaccurate or irrelevant, it must strike that information from the PSIR before sending the report to the Department of Corrections. [*People v Maben*, 313 Mich App 545, 553-554; 884 NW2d 314 (2015) (quotation marks and citations omitted).]

Defense counsel noted defendant's concerns with the factual content of certain provisions within the PSIR. The trial court acknowledged defendant's concerns and indicated specifically with regard to the responsibility to provide for defendant's children that the information was irrelevant to the trial court. In addition, the trial court implied that the information defendant challenged was irrelevant to its sentencing decision when it stated, "All that being said, I don't think any of this would help the Court determine if it should be above the guidelines or below. I think the guidelines sufficiently embrace the facts in this particular situation." Under the circumstances, we do not believe that the trial court's response to defendant's factual challenges to the PSIR was an abuse of discretion. However, upon finding that the challenged information was inaccurate or irrelevant, the trial court was required to "strike that information from the PSIR before sending the report to the Department of Corrections." *Id.* This the trial court did not do, as the challenged information appears in the copy of the PSIR received by this Court.[14] "[B]ecause the trial court did not rely on the challenged information in the PSIR in sentencing

---

[14] To the extent defendant seeks to remove from the PSIR a description of the events of the crime taken from and attributed to the police report, her claim fails. Defendant may seek correction of factual mistakes in the PSIR, but she may not control what can be included in the PSIR unless otherwise prohibited by law.

defendant, resentencing is not required; rather the remedy is to remand for the limited purpose of correcting the PSIR." *People v Spanke*, 254 Mich App 642, 650; 658 NW2d 504 (2003).

## IV. CONCLUSION

We conclude that the evidence was sufficient to support the jury's conviction of defendant for second-degree murder on an aiding and abetting theory, the trial court did not commit reversible error,[15] defense counsel did not render ineffective assistance of counsel, and the trial court did not err in sentencing defendant. Accordingly, we affirm the defendant's conviction and sentence.

Affirmed, but remanded for correction of the PSIR. We do not retain jurisdiction.

/s/ Kathleen Jansen
/s/ Jane M. Beckering
/s/ Michael F. Gadola

---

[15] Having thus found no error, defendant's claim in her supplemental brief that cumulative error deprived her of a fair trial necessarily fails.